**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **OLIVER L. POWELL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:12-CV-1489-BH** |
| | § | |
| **CAROLYN W. COLVIN, ACTING** | § | |
| **COMMISSION OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the *Order Transferring Case* dated July 22, 2012, this case has been transferred for the conduct of all further proceedings and the entry of judgment. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed September 14, 2012 (doc. 20), and *Defendant's Motion for Summary Judgment*, filed October 15, 2012 (doc. 21). Based on the relevant filings, evidence, and applicable law, the plaintiff's motion is **GRANTED in part**, the defendant's motion is **DENIED**, and the case is **REMANDED** for further proceedings.

## I. BACKGROUND[1]

### A.  Procedural History

Oliver Lee Powell (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner) denying his claims for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act. (Doc. 20 at 1.) Plaintiff applied for DIB and SSI on July 18, 2008, alleging disability beginning January 1, 2004, due to stroke, high blood pressure, back problems, kidney disease, and

---

[1] The background comes from the transcript of the administrative proceedings, which is designated as "R."

heart problems.  (R. at 180–87, 201.)  His claims were denied initially and upon reconsideration.  (R. at 111, 125.)  Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing held on November 18, 2009.  (R. at 71.)  On February 19, 2010, the ALJ issued his decision finding Plaintiff not disabled.  (R. at 68–77.)  Plaintiff requested review and submitted additional medical evidence, and the Appeals Council denied his request for review,[2] making the ALJ's decision the final decision of the Commissioner.  (R. at 1–6.)  He timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).  (*See* Doc. 1.)

B.    **Factual History**

1.    **Age, Education, and Work Experience**

Plaintiff was born on October 28, 1954, and was 55 years old at the time of the hearing before the ALJ.  (R. at 84, 180.)  He graduated high school, completed a few years of college, and has past relevant work as a customer service clerk and an accounting clerk.  (R. at 85–86.)

2.    **Medical Evidence, Psychological, and Psychiatric Evidence**

On June 11, 2006, Plaintiff visited the emergency room at the Dallas VA Medical Center (VAMC) and was admitted.  (R. at 762–64.)  He presented with chest pain due to high blood pressure - 218/135, and stated that he had not taken blood pressure medication for the past five to six months.  (R. at 762–63.)  Upon discharge, his blood pressure was stable at 166/96 without any chest pain.  (R. at 764.)

---

[2]  The Appeals Council denied Plaintiff's request for review on May 27, 2011 without making any reference to the additional evidence.  (R.  at 58–60.)  Plaintiff filed a Request to Vacate Action and Reopen Appeals Council Request for Review on June 22, 2011, noting the omission.  (R. at 7.)  Subsequently, the Appeals Council reissued its decision to deny Plaintiff's request for review, stating that the additional evidence did not provide any reason to review the ALJ's decision.  (R. at 1.)

Plaintiff saw his primary care physician, Dr. Ravindra Ratakonda, for the first time on August 17, 2006.  (R. at 746.)  He had no medical complaints on that day.  (*Id.*)

On September 20, 2006, Plaintiff presented to the emergency room at the VAMC due to an accident while he was working as a "roofing/aluminum siding installer."  (R. at 743–44.)  He was injured when a plywood sheet fell on his right hand.  (*Id.*)

On June 23, 2008, Plaintiff was hospitalized at the VAMC for dizziness and numbness.  (R. at 369–70.)  A Magnetic Resonance Imaging (MRI) of his head and neck showed that he had recently suffered a stroke.  (R. at 503–34.)  A kidney bilateral exam showed signs of medical renal disease.  (R. at 507.)  Laura L. Deon, M.D., the examining physician, observed him to have no functional problems other than slight weakness on the right side.  (R. at 345–46.)  She found he was independent with his activities of daily living, could ambulate without assistance, and had full strength on all his extremities.  (R. at 342, 344.)  Plaintiff stated that "he could walk as far as he wanted to prior to this hospitalization."  (*Id.*)  At the time of discharge, he assessed his primary pain level at zero and moved all of his extremities well.  (R. at 328, 337.)

On July 16, 2008, Erika Navarro, M.D., a psychiatrist at the VAMC, conducted a mental health triage evaluation and noted that Plaintiff suffered from depression secondary to his stroke in June 2008.  (R. at 304.)

An MRI scan of Plaintiff's lumbar spine taken on July 23, 2008, showed evidence of degenerative changes, ligament hypertrophy, and neuroforaminal stenosis.  (R. at 498–99.)  Manoj A. Ketrar, M.D. diagnosed him with spondylolisthesis"[3] at L4–L5, scoliosis of the spine, and disc

---

[3] Spondylolisthesis is a "congenital defect where the neural arch of the vertebra causes one vertebra to slip forward upon another, most commonly in the lower lumbar vertebra." *Ausman & Snyder's Medical Library* 69 (L. Ed, Lawyer's Cooperative Publishing Co., 1989).  The most common symptom is lower back pain, which is exacerbated by exercise, especially with extension of the lumbar spine.  *See id.*

bulging at L5–S1 (the lower spine).  (*Id.*)  The impression was "major abnormality."  (R. at 499.)

That day, Plaintiff also complained of blurred vision and dizziness, and had an "unsteady" gait.  (R.

at 500.)  An MRI of his brain taken two days later revealed "centrum semiovale and peritrigonal

white matter bilaterally" that were "consistent with chronic ischemia."  (R. at 1061–62.)  After

recovering from his stroke, Plaintiff regained full strength in all of his extremities.  (R. at 799, 1149,

1169, 1185, 1363.)

On September 19, 2008, a VAMC nurse observed that Plaintiff used a walker, but noted that

"[h]e [was] not dependent on this for all of his mobility."  (R. at 792.)  On October 8, 2008, Plaintiff

underwent an adenosine stress test, and the result was normal.  (R. at 533.)  A MRI of his cervical

spine was taken on October 28, 2008, because Plaintiff complained of "chronic neck pain and

radiculopathy." (R. at 531.)  Mild degenerative changes and disc bulging were noted at C3–C4 and

C4–C5, but the impression was otherwise unremarkable.  (R. at 532.)

Upon review of his treatment records from June 23, 2008 through October 29, 2009, Leela

Reddy, a state agency medical consultant (SAMC), completed a Psychiatric Review Technique Form

(PRTF).  (R. at 534–47.)  She determined that Plaintiff's depressive disorder was not severe.  (R.

at 534.)  She also opined that Plaintiff was mildly restricted in his activities of daily living; social

functioning; and maintaining concentration, persistence, and pace; and had experienced no episodes

of decompensation of extended duration.  (R. at 544.)  Dr. Reddy observed that Plaintiff's daily

activities were "mostly limited by [his] physical condition."  (R. at 546.)  She noted Plaintiff's

statements to physicians that he handled stress well, got along well with others, did not need

reminders to perform tasks, could use public transportation, and shopped independently.  (*Id.*)

On October 30, 2008, Dr. Kelvin Samaratunga, another SAMC, reviewed Plaintiff's medical

records and completed a physical Residual Functional Capacity (RFC) assessment. (R. at 548–55.)

Dr. Samaratunga determined that Plaintiff had the following physical RFC: lift and carry 50 pounds

occasionally and 25 pounds frequently; stand, walk, and sit for about six hours in an eight-hour

workday; push and pull an unlimited amount of weight; and no postural, manipulative, visual,

communicative, or environmental limitations. (R. at 549–52.) Dr. Samaratunga acknowledged

Plaintiff's history of stroke, high blood pressure, kidney disease, and back and heart problems. (R.

at 549.) He also observed that Plaintiff walked with a walker, but that it was not obligatory. (R. at

550.) He concluded that Plaintiff's "alleged limitations [were] not fully supported by the [medical

evidence of record] and other evidence." (R. at 553.)

The following month, a VAMC nurse opined that Plaintiff was "capable of work[ing] with

support." (R. at 573.) On January 14, 2009, Plaintiff told a counselor that he desired to work. (R.

at 1149.) The counselor noted that Plaintiff had been denied entry to an employment program in

July 2008, and again in September 2008, due to his health. (*Id.*) They discussed the possibility for

Plaintiff to work in customer service-type work rather than those employment programs. (*Id.*)

On April 24, 2009, Plaintiff followed up with Dr. Ratakonda. (R. at 1109.) He was noted

to be "taking all [his] medication." (*Id.*) He stated that his pain was primarily in his lower back,

rated his pain at 8, and explained that it increased with exercise, movement, manipulation, standing,

and walking. (*Id.*) His pain was "always there" but fluctuated in severity. (*Id.*) Among other

things, his pain affected his sleep, appetite, physical activity, sexual activity, concentration, and

work productivity. (*Id.*) Dr. Ratakonda noted that he no longer had weakness in his right side, and

advised him to "keep walking and exercis[ing.]" (R. at 1108.) Plaintiff "decline[d] the

recommended changes in [his] medications to improve [his blood pressure] control." (*Id.*) On

December 22, 2009, Susan Bryant, P.A. at the VAMC's neurology clinic, advised Plaintiff to avoid a sedentary lifestyle to minimize his risk of having a future stroke.  (R. at 1360.)

During a counseling session at the VAMC on December 5, 2010, Plaintiff reported that he did not feel depressed, and a depression screening was negative.  (R. at 54–55.)

On February 11, 2011, Plaintiff was administered a "medial branch [steroid] injection" for his lower back pain at the VAMC pain management clinic.  (R.  at 33–34.)

Plaintiff was hospitalized at the VAMC due to his high blood pressure on multiple occasions. (*See* R. at 398, 678, 725.)  He often complained of chest pains and dizziness, which physicians attributed to his uncontrolled blood pressure.  (R. at 678, 756, 762.)  When he was compliant with his medications, his symptoms seemingly improved.  (R. at 301, 363, 632, 677, 690–94, 724, 735–36, 739, 764, 776, 852, 919.)  He was often observed to be non-compliant, however.  (*See* R. at, 346, 689, 697, 734, 738, 762, 1267, 1360.)  During numerous visits to the VAMC, Plaintiff rated his lower back pain at levels ranging from 0 to 8 on a 10-point scale.  (*See e.g.*, R. at 31, 46–47, 55, 293–94, 308–09, 686–87, 701, 828, 961, 1199.)

### 3.    Hearing Testimony

On November 18, 2009, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 83–104.)  Plaintiff was represented by an attorney.  (R. at 83.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that he was 55 years old and lived alone.  (R. at 84, 91.)  Although his initial onset date of disability was alleged to be January 1, 2004, he corrected that date to June 13, 2006.  (R. at 84.)  He was six feet, four inches tall and weighed about 217 pounds.  (R. at 85.)  He graduated from high school and completed "a couple of years of college."  (*Id.*)

Plaintiff mostly held accounting positions in the past 15 years. (*Id.*) He had worked on business development and had done payroll processing for Exxon Mobile in the early 80s. (R. at 86.) He also handled accounts payable for a temporary agency in 1994 or 1995. (*Id.*)

Plaintiff began experiencing problems from a stroke he had suffered the previous year and had suffered from lower back pain for the past few years. (*Id.*) He also had an issue with a sciatic nerve and degenerative disc disease. (*Id.*)

Plaintiff could not sit or stand for longer than 5 to 15 minutes. (R. at 87.) He began using a walker the year before, but could only walk about half a block even with the walker. (*Id.*) He kept a big jug of water in the refrigerator and had a hard time bending over to lift it. (R. at 88.) He could squat and kneel, but had difficulty getting up. (*Id.*) He could sit, stand, and walk for a total of one to one-and-a-half hours each day. (R. at 90.) He rated his pain at 8 and 10, which was tolerable once or twice a month. (R. at 93, 95.) He was never free of pain. (R. at 93.) It was mainly in his lower back, hips, and pelvic area, and radiated down to his legs. (R. at 95.) He took hydrocodone three times a day and Tylenol to relieve his pain. (R. at 94–96.)

Plaintiff spent most of his day laying down on his right side, and "sometimes . . . tr[ied] to get up and [] try to vacuum a little bit and maybe try to cook something that [was] fast cooking," as long as those chores did not require him to stand for too long. (R. at 91.) He went grocery shopping on his own. (R. at 92.) His brother and sister helped him around the house. (*Id.*)

### b.  VE's Testimony

A vocational expert (VE), also testified at the hearing. (R. at 83, 94, 100.) She classified Plaintiff's past relevant work as customer service clerk (sedentary, SVP-5) and accounting clerk (sedentary, SVP-5). (R. at 94.) The ALJ asked the VE whether sedentary work would permit a

person to sit or stand at will.  (R. at 100.)  The VE opined that sedentary work would permit the person to "stand and stretch for a couple [of] minutes" every half an hour, but it would not "necessarily be an at will situation."  (*Id.*)

## C.   ALJ's Findings

The ALJ issued his decision denying Plaintiff's application on February 19, 2010.  (R. at 68–77.)  At step one, the ALJ found that Plaintiff met the insured status requirements through December 30, 2008, and had not engaged in substantial gainful activity since June 13, 2006, his amended onset date.  (R. at 73.)  At step two, the ALJ found that Plaintiff had five severe impairments: (1) late effects of cerebrovascular disease (stroke); (2) high blood pressure; (3) back problems; (4) kidney disease; and (5) heart problems.  (*Id.*)  At step three, the ALJ found that Plaintiff did not have a severe impairment or combination of impairments that met or medically equaled any impairment listed in the regulations.  (*Id.*)

Before proceeding to step four, the ALJ determined that Plaintiff had the RFC to "perform the full range of sedentary work."  (R. at 74.)  At step four, ALJ found that Plaintiff could perform his past relevant work of customer service representative and accounting clerk.  (R. at 76–77.)  He therefore concluded that Plaintiff was not disabled at any time between his alleged onset date and the date of the ALJ's decision. (R. at 77.)

## D.   New Evidence Submitted to the Appeals Council

Plaintiff appealed the ALJ's decision to the Appeals Council on May 13, 2011.  (R. at 9–21.) He submitted a physical RFC assessment from Dr. Ratakonda dated March 3, 2010, as well as medical records from the VAMC dating from December 2, 2010 through February 15, 2011.  (R. at 1377–1413.)  In her assessment, Dr. Ratakonda noted Plaintiff's primary diagnosis as chronic low

back pain with moderate severity.  (R. at 23.)  She opined that Plaintiff was "not able to sit or stand [for] [a] long time" and noted that he used a cane and walker.  (R. at 1378–79.)  She opined that Plaintiff could do the following: leave his home only "2-3 times" per week, walk and get around unassisted, dress and undress independently, attend to the needs of nature unassisted, wash and keep himself clean and presentable, and physically protect himself from everyday life hazards.  (R. at 1379.)  She opined that Plaintiff was mentally unable to protect himself from everyday hazards of life.  (*Id.*)  The VAMC treatment notes detailed multiple visits to the pain management clinic and radiology department, as well as routine follow-ups.  (*See* R. at 1382–1413.)

On May 27, 2011, the Appeals Council initially denied Plaintiff's request for review.  (R. at 58.)  The Appeals Council issued another decision on April 10, 2012, vacating its May 27, 2011 decision, and again denied review, explaining that it had considered Plaintiff's new evidence but "found no reason . . . to review the [ALJ's] decision."  (R. at 1.)

## II.  ANALYSIS

### A.  <u>Legal Standards</u>

#### 1.  *Standard of Review*

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence

standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id*.  Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *See id*. at 436 and n.1.

### 2.     *Disability Determination*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563-64.  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status."  *Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*,

770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(I)–(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first 4 steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step 5 to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457,

11

461 (5th Cir. 2005).  "A finding that a claimant is disabled or is not disabled at any point in the five-

step review is conclusive and terminates the analysis."  *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir.

1987).

**B.      Issues for Review**

Plaintiff raises three issues for review:

1.      Evidence submitted for the first time to the Appeals Council is considered part of the
record upon which the Commissioner's final decision is based. [Plaintiff] submitted
evidence to the Appeals Council from his treating physician, which directly
contradicts the ALJ's findings.  Did the new evidence dilute the record upon which
the ALJ's decision was based such that the ALJ's decision is not substantially
supported?;

2.      The ALJ must provide support for an adverse finding at step three of the five-step
disability analysis.  If the ALJ fails to provide such support and a claimant's
substantial rights are affected, a remand is required.  Here, the ALJ failed to state
what listings were considered or cite to any evidence to support his step three
finding. [Plaintiff] provided evidence that he met or medically equaled Listing 1.04.
Does the ALJ's step three error require remand?; [and]

3.      The RFC finding is representative of the most an individual can do in the workplace
on a regular and continuing basis.  It must be supported by substantial evidence.  The
ALJ found [Plaintiff] capable of performing a full range of sedentary work.  Is the
RFC finding supported by substantial evidence when it fails to consider directly
contradicting evidence of the limitations caused by [Plaintiff's] impairments?

**C.      New Evidence**

Plaintiff claims the Appeals Council erred in denying his request for review even though new

treatment records from the VAMC and an RFC assessment completed by his treating physician

"directly contradict[ed] the ALJ's reasoning and RFC assessment."  (Pl. Br. at 11.)  He argues that

remand is required because this "new and material evidence" diluted the record to the extent that the

ALJ's disability determination was unsupported by substantial evidence.  (*Id.* at 19.)

*1.      New Evidence*

When a claimant submits new and material evidence that relates to the period before the date

12

of the ALJ's decision, the Appeals Council must consider the evidence in deciding whether to grant a request for review.   20 C.F.R. § 404.970(b) (2012).   New evidence submitted to the Appeals Council becomes part of the record upon which the Commissioner's decision is based. *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005).   A court considering the Appeals Council's decision must review the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence, and should remand only if the new evidence dilutes the record to such an extent that the ALJ's decision becomes unsupported.   *Higginbotham v. Barnhart*, 163 F. App'x 279, 281–82 (5th Cir. 2006); *Morton v. Astrue*, No. 3:10-CV-1076-D, 2011 WL 2455566, at *7 (N.D. Tex. June 20, 2011) (Fitzwater, C.J.) ("The proper inquiry concerning new evidence takes place in the district court, which considers whether, in light of the new evidence, the Commissioner's findings are still supported by substantial evidence.") (citations omitted).

Here, Plaintiff's new evidence consisted of a physical RFC assessment completed by Dr. Ratakonda, his treating physician, on March 3, 2010, and treatment records from the VAMC dating from December 2, 2010 to February 15, 2011.  (R. at 23–24, 1378–1413.)[4]

## 2.    *Treating Physician Rule*

Plaintiff claims the Appeals Council erred in failing to give controlling weight to Dr. Ratakonda's RFC assessment, or in the alternative, failing to find "good cause" for not analyzing her assessment using the factors listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c), even though it was supported by the record and there was no competing first hand medical evidence.  (Pl. Br. at 15.)

---

[4]Although Dr.  Ratakonda's RFC assessment was dated March 2, 2010, her assessment related to the treatment period between August 8, 2008 and March 3, 2010.  (R.  at 1378.)  It therefore met the timing element of materiality required to consider new evidence. *See Latham v.  Shalala*, 36 F.3d 482, 483-84 (5th Cir.  1994) (finding that the new evidence was material because at least part of it related to the time period for which the benefits were denied).  The Commissioner did not allege that the new evidence was immaterial.

13

The Appeals Council was required to consider Dr. Ratakonda's March 3, 2010 RFC assessment using the "treating physician rule" because she was Plaintiff's treating physician. *See Jones v. Astrue*, No. CIV.A. H-07-4435, 2008 WL 3004514, at * 3 (S.D. Tex. Aug. 1, 2008) (applying the treating physician rule to new medical records and an RFC assessment submitted to the Appeals Council by the claimant's treating physician); *see also* 20 C.F.R. § 404.1527(e)(3) ("When the Appeals Council makes a decision, it will follow the same rules for considering opinion evidence as [ALJs] follow.").

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1520(b) and 404.1527(c). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citing 20 C.F.R. § 404.1527(c)(2)).

If controlling weight is not given to a treating source's opinion, the Commissioner applies six factors in deciding the weight given to the opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to

14

support or contradict the opinion." 20 C.F.R. § 404.1527(c)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455–56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453 (emphasis in original). A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

a.      ALJ's Findings as Adopted by the Appeals Council

As discussed, new evidence submitted for the first time to the Appeals Council warrants remand only if it dilutes the record to such an extent that the ALJ's decision becomes unsupported by substantial evidence. *Higginbotham*, 163 F. App'x at 281–82. If, "in light of the new evidence, the [ALJ's] findings are still supported by substantial evidence," however, the Court must affirm the Commissioner's decision. *Morton*, 2011 WL 2455566, at *7.

Here, the ALJ determined that Plaintiff had the physical RFC to perform sedentary work.[5] (R. at 74.)  Based on the VE's classification of Plaintiff's past relevant work as sedentary, the ALJ concluded at step four that Plaintiff was not disabled because he could perform his past relevant work as a customer service representative and an accounting clerk.  (R. at 74, 77.)

In his narrative discussion, the ALJ acknowledged Plaintiff's testimony that he suffered a stroke a year before the hearing, and had lower back pain, "lumbar degenerative disc disease," and "a sciatic nerve."  (R. at 74, 85–86.)  He also referenced Plaintiff's testimony regarding his physical limitations, including that he could stand for only 15 minutes at a time and needed assistance getting up and down.  (R. at 74, 88–90.)  He implicitly rejected Plaintiff's allegation that he could sit for a "total" of one to one-and-a-half hours in an eight-hour workday.  (R. at 74, 90.)  He noted that the side effects from Plaintiff's medications appeared to be "mild" and would not significantly "interfere with [his] ability to perform work activities."  (R. at 75.)

The ALJ also underscored Plaintiff's stated ability to engage in daily living activities, such as vacuuming and cooking simple meals.  (R. at 76, 91.)  He found important Plaintiff's statement to a counselor in April 2009 that he was seeking employment through a vocational rehabilitation specialist.  (R. at 76, 1149.)  He concluded that if Plaintiff was "as limited as he [] alleged," he would likely not be able to perform those activities.  (R. at 76.)

The ALJ also acknowledged Plaintiff's stroke on June 23, 2008, as well as MRI impressions of his brain taken that day showing "chronic ischemic changes" and "deep white matter involving the brain parenchyma."  (R. at 75, 499, 1061–62.)  Similarly, the ALJ referenced the MRI of his lumbar spine taken in July 2008 that showed "degenerative changes with desiccation" and disc

_____

[5]  Sedentary work requires "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. § 404.1567(a).  "Although a sedentary job is defined as one which involves sitting, [occasional] walking and standing is often necessary in carrying out job duties."  *Id.*

bulging causing neuroforaminal stenosis at the L4–L5 levels.  (R. at 75, 499.)  The ALJ summarized

multiple treatment records dating from September 24, 2008 to October 23, 2008.  (R. at 75–76.)

        The ALJ considered important the lack of opinion evidence "from treating or examining

physicians indicating that [Plaintiff] was disabled or even ha[d] limitations greater than those" the

ALJ incorporated in his RFC assessment.  (R. at 76.)  Although he stated he gave "great weight" to

the RFC assessment of Dr. Samaratunga, a SAMC, the ALJ implicitly rejected his opinion that

Plaintiff could perform medium work[6] by restricting him to sedentary work, which limits weight

lifting and carrying to 10 pounds or less.  (*See* R. at 74, 76.)  Because the ALJ did not include

specific physical limitations in his RFC assessment, such as weight lifting and carrying or sitting

restrictions, it is unclear whether he accepted or rejected Dr. Samaratunga's opinion that Plaintiff

could stand, walk, and sit for six hours in an eight-hour workday.  (*See* R. at 74, 76.)  The ability to

perform medium or light work is not readily interchangeable with the ability to perform sedentary

work because "additional limiting factors," such as the "inability to sit for long periods of time,"

must still be considered.  *See* 20 C.F.R. § 404.1567(b).  The ALJ's opinion does not include any

express findings regarding Plaintiff's ability to sit for a long time.  (*See* R. at 71–77.)

        b.    Dr. Ratakonda's March 3, 2010 RFC Assessment

        Dr. Ratakonda identified Plaintiff's primary illness as "chronic low back pain" of

"moderate" severity.  (R. at 1378.)  She opined that Plaintiff was "not able to sit or stand for [a] long

time," could leave his home only two or three times per week, and used a cane and walked with a

---

        [6] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of
objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do
sedentary and light work."  20 C.F.R. § 404.1567(c).  "Light work involves lifting no more than 20 pounds at a time
with frequent lifting or carrying of objects weighing up to 10 pounds . . . If someone can do light work, we
determine that he or she can also do sedentary work, *unless there are additional limiting factors* such as loss of fine
dexterity or *inability to sit for long periods of time*." *Id.* § 404.1567(b) (emphasis added).

walker.  (R. at 1378–79.)  She also indicated that Plaintiff could do the following activities "unassisted": walk and get around, dress and undress himself, "attend to the needs of nature", wash and keep himself ordinarily clean and presentable, and physically protect himself "from the everyday hazards of life."  (R. at 1379.)  Lastly, she indicated that Plaintiff was not "mentally able" to protect himself from every day hazards.  (*Id.*)

Dr. Ratakonda's diagnosis of chronic low back pain was supported by Plaintiff's diagnosis of spondylolisthesis at L4–L5, of which the most common symptom is lower back pain (*see Ausman & Snyder's Medical Library* at 69), and scoliosis and disc bulging at L5–S1 (the lumbar spine).  (R. at 498–99.)  The MRI of Plaintiff's lumbar spine taken on July 23, 2008, revealed ligament hypertrophy and neuroforaminal stenosis and degenerative disc disease.  (*Id.*)  Further, Dr. Ratakonda's opinion that Plaintiff could not sit or stand for a long time was not inconsistent with her observation that Plaintiff could walk unassisted, or with her advice to Plaintiff on April 24, 2009, that he should "keep walking and exercis[ing]."  (*See* R. at 1108, 1378–79.)  During that consultation, despite taking all of his medications, Plaintiff rated his pain at 8 on a 10-point scale and explained that it was located primarily in his lower back, increased with exercise, manipulation, standing, and walking, and was constant but fluctuated in severity.  (R. at 1108–09.)  Plaintiff testified that he had pain primarily in his lower back, hips, and pelvic area, he could sit and stand for only 15 minutes at a time, and the longest he could sit during an eight-hour workday was one to one-and-a-half hours.  (R. at 86, 89–90.)

Although a treating physician's opinion may be rejected when the physician lacks credibility, the decision maker must find "with support in the record, that the physician is not credible and is 'leaning over backwards to support the application for disability benefits.'"  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985) (citation omitted).  Here, the Appeals Council did not make such a

finding with respect to Dr. Ratakonda's assessment.  The Appeals Council was required to analyze her assessment using the factors listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c) because her opinions were not conclusory or controverted by first-hand medical evidence, and they were supported by the record.  *See Newton*, 209 F.3d at 453–55.  Instead of doing so, the Appeals Council summarily dismissed them as providing "no reason" to review the ALJ's decision.  (R. at 1.)  The Appeals Council did not find "as a factual matter" that another physician's opinions were better founded than Dr. Ratakonda's, nor did it weigh her assessment "against the medical opinion of other physicians who *ha[d] treated or examined*" Plaintiff and had "specific medical bases for a contrary opinion."  *See Newton*, 209 F.3d at 458 (emphasis added).  It is even unclear, based on the ALJ's decision alone, whether Dr. Samaratunga's opinions (the only other medical opinion evidence of record) regarding Plaintiff's sitting limitations were incorporated into the ALJ's RFC assessment. (*See* R. at 74.)  Notably, while the ALJ underscored the lack of opinion evidence from treating or examining sources indicating that Plaintiff had "greater" limitations than those he incorporated in his RFC assessment, Dr. Ratakonda's assessment indicated that Plaintiff had sitting limitations.  (R. at 76, 1378.)  The Appeals Council did not address this discrepancy.  (R. at 1–4.)

In conclusion, by failing to properly evaluate Dr. Ratakonda's treating opinions under 20 C.F.R. §§ 404.1527(c) and 416.927(c), the Appeals Council committed legal error.  *See Jones*, 2008 WL 3004514, at *4 (holding that the Appeals Council erred by failing to analyze a treating physician's new and uncontroverted evidence using the factors listed in 20 C.F.R. §1527(c), or by otherwise failing to provide "good cause" for rejecting the doctor's opinions; noting that "[t]he dearth of analysis from the Appeals Council [did] not reflect any of the criteria which must be

explained when evaluating a medical source opinion");[7] *see also Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (violation of a regulation constitutes legal error).

c.   <u>Harmless Error Analysis</u>

Although the Appeals Council erred by improperly evaluating Dr. Ratakonda's RFC assessment, the Court must still consider whether the error was harmless. *See McNeal v. Colvin*, No. 3:11-CV-02612-BH-L, 2013 WL 1285472, at *27 (N.D. Tex. Mar. 28, 2013) (applying harmless error analysis to the ALJ's failure to properly evaluate treating opinion under 20 C.F.R. §§ 404.1527(c) and 416.927(c)).   In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette*, 466 F. Supp. 2d at 816 (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

The Commissioner essentially contends that the Appeals Council's rejection of Dr. Ratakonda's opinions does not warrant reversal because other medical evidence, including Dr. Ratakonda's advice to Plaintiff that he should walk and exercise, conflicted with her assessment.[8] (D. Br. at 5–6.)   As noted, Dr. Ratakonda's opinion that Plaintiff could not *sit* for a long time does

---

[7]   The court recognized that the Hearings, Appeals, and Litigation Law Manual (HALLEX), which required the Appeals Council to "explain the weight and treatment given to *all* new evidence submitted" with a claimant's request for review, was temporarily suspended by a memorandum from the Executive Director of Appellate Operations, dated July 20, 1995. *See Jones*, 2008 WL 3004514, at *4 (emphasis in *Jones*); *see also Newton*, 209 F.3d at 448.   Nevertheless, the court emphasized the requirement of Social Security Ruling (SSR) 96-5p (which was promulgated "well after" HALLEX was suspended) that "adjudicators" provide "appropriate explanations for accepting or rejecting [medical source] opinions." *Jones*, 2008 WL 3004514, at *4 (citing SSR 96-5P, 1996 WL 374183, at *4 (S.S.A July 2, 1996)).   Based on then 20 C.F.R. §§ 404.1527(d) and 416.927(d) and SSR 96-5p, the court concluded "that remand [was] warranted to provide the Commissioner with the opportunity to reconcile the ALJ's findings with the conflicting supplementary evidence [from the treating physician] admitted by the Appeals Council, along with all other evidence of record, in the explanatory fashion required by the [Social Security] Act, SSR 96-5p, and precedent of the Fifth Circuit." *Id.*

[8]   The Commissioner points to Dr. Bryant's recommendation to Plaintiff on December 22, 2009, that he should avoid a sedentary lifestyle to minimize his risk of having a future stroke.  (D. Br. at 5); (R. at 1360).  The ALJ's finding that Plaintiff could perform sedentary work can reasonably be said to conflict with Dr. Bryant's advice.  The Commissioner also identifies evidence that does not relate to Plaintiff's lower back condition or his ability to sit for extended periods, such as "unremarkable" MRI findings of his cervical spine (neck) and physicians' observations that he had a normal gait and a full range of motion in all of his extremities.  (*See* D. Br. at 5.)

not conflict with her advice that he should *walk and exercise*.

The ALJ concluded that Plaintiff had the physical RFC to perform the full range of sedentary work, which involves sitting with occasional walking and standing.  (R. at 74); *see also* 20 C.F.R. § 404.1567(a).  Because he did not incorporate any physical (e.g., any sitting) limitations into his RFC, his only question to the VE was whether sedentary work would allow Plaintiff to sit and stand at will.  (R. at 100.)  At step four, based solely on the VE's classification of Plaintiff's past relevant work as sedentary, the ALJ concluded that Plaintiff could perform his past relevant work of customer service representative and accounting clerk.  (R. at 76, 94.)  If the ALJ had the opportunity to consider Dr. Ratakonda's opinion that Plaintiff could not sit for a long time, it is not inconceivable that he would incorporate at least some sitting restrictions into his physical RFC.  It is therefore not inconceivable that the ALJ would pose a different hypothetical to the VE and reach a different disability determination at step four.  In light of Dr. Ratakonda's RFC assessment, the ALJ's disability determination cannot be said to be supported by substantial evidence.  Because the new evidence diluted the record to the extent that the ALJ's decision became unsupported, and because the Appeals Council committed error in evaluating it, remand is required on this issue.[9]

### III. CONCLUSION

Plaintiff's motion is **GRANTED in part**, the Commissioner's motion is **DENIED**, and the case is **REMANDED** to the Commissioner for further proceedings.

---

[9] Because remand is required based on the Appeals Council's error in evaluating Dr. Ratakonda's RFC assessment, it is unnecessary to reach Plaintiff's argument regarding his additional treatment records from the VAMC.  Notably, the treatment records postdated the ALJ's decision on February 19, 2010, failing to meet the materiality requirement.  *See Johnson v. Heckler*, 767 F.2d 180, 183 (5th Cir. 1985) (ruling that the Commissioner need "not concern evidence of later-acquired disability or of the subsequent deterioration of the previously non-disabling condition.") (citation omitted).  The Commissioner did not address this issue.

**SO ORDERED**, on this 30th day of September, 2013.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE